Alan A. Dressler, Esq. (SBN 56916)
400 Montgomery St., Ste 200
San Francisco, CA 94104
Tel.  (415) 421-7980
Fax  (415) 421-7021
E-Mail: alandressler@aol.com

Attorney for Defendant
Pasquale Iannetti

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09-0850 VRW |
| Plaintiff, | **DEFENDANT  IANNETTI'S NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| PASQUALE IANNETTI, | |
| Defendant. | Date:   March 25, 2010<br>Time:   2:00 p.m.<br>Judge:   Hon. Vaughn  R. Walker |

TO: JOSEPH P. RUSSONIELLO, United States Attorney
    SUSAN BADGER, Assistant United States Attorney

PLEASE TAKE NOTICE that defendant  Pasquale Iannetti  moves this Court for an order suppressing as evidence all purported statements obtained during his interrogation by United States Postal Inspectors on February 20, 2008.

This motion is made on the ground that the statements were taken in violation of Mr. Iannetti's constitutional right to remain silent, and to due process under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Fed. R. Crim. P., Fed. R. Evid., and all other applicable statutes.

Dated: August 4, 2009                    Respectfully submitted,

_____
Alan A. Dressler
Attorney for Defendant Iannetti

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF FACTS[1]**

 It is alleged that during November of 2007  Elio Bonfiglioli entered the United States with a number of counterfeit art prints purportedly created and signed by the artist Joan Miro. Bonfiglioli then  traveled to San Francisco, California were  he sold one or more of the counterfeit prints, including one entitled  "Quatre Colors Aparien El Mon" ("Quatre Colors"), to defendant  Iannetti (Iannetti) on or about November 8th or 9th, 2007.  In 2007 and 2008 Mr. Iannetti was the owner of the Pasquale Iannetti Art Gallery located at 565 Sutter Street in San Francisco, California.

     In December of 2007 postal inspector Marius Greenspan (Greenspan), acting in an undercover capacity purchased the "Quatre Colors" print from Mr. Iannetti's gallery.  In  January 2008 the "Quatre Colors"  purchased by Greenspan was examined by an art expert who determined it to be a counterfeit.  On February 20, 2008 at approximately 10: 00 a.m. at least eight postal inspectors executed a search warrant at Mr. Iannetti's gallery.

     The warrant authorized the seizure all Miro prints and certain business records located in the gallery. Mr. Iannetti, who is the owner of the gallery, was not present when the postal agents entered to execute the search warrant.  Approximately two hours after the agents began searching the gallery Mr. Iannetti, who was at home at the time, received a call from Greenspan and was ordered to come to the gallery as soon as possible. He was told that he would have to knock on the door to gain entry.  Mr. Iannetti complied and when he knocked on the door he was greeted by Greenspan and directed to follow him to the back of the gallery.  Once there Greenspan and Iannetti were joined by postal inspector Patrick Esteban (Esteban).  Iannetti was then instructed to follow the Esteban and Greenspan into what is known as the "viewing room" where he was

---

[1] The Statement of Facts stems in part from the Memorandum of Interview of Pasquaale Iannetti prepared by Postal Inspector Patrick R. Esteban, see Exhibit "D" and portions of a Search Warrant, See Exhibit "C".  Mr. Iannetti does not adopt the facts and statements set forth in Exhibits D and C and reserves the right to contest these facts and statements at hearing or trial.

Motion To Suppress Statements

CR 09-0850 VRW                                          2

1   interrogated for over three hours. Just prior to the commencement of the interrogation Mr.

2   Iannetti was advised by Greenspan that they did not come to the gallery to arrest him or shut his

3   business down.  Iannetti was then asked to review  the search warrant and attachments.  Mr.

4   Iannetti was allowed to leave the viewing room on two occasions. The first was when he

5   requested to use the bathroom. He was accompanied to and from the bathroom by one of the

6   postal inspectors. Approximately two hours into the interrogation Mr. Iannetti's wife, Elena

7   Iannetti attempted to enter the gallery in order to locate and comfort her husband.  She was

8   initially denied entry by an agent who told the gallery was closed and shut the door in her face.

9   She eventually forced her way into the gallery and was allowed to remain until the agents

10  completed their interrogation. However, during this time she was physically isolated from Mr.

11  Iannetti.

12       Submitted herewith is (1) a declaration from Mr. Iannetti which sets forth  the

13  circumstances surrounding  his interrogation[2]. (Exhibit A); (2) a declaration from Mrs. Iannetti

14  which sets forth the circumstances of her entry into the gallery during Mr. Iannetti's interrogation

15  (Exhibit B); (3) A number of pages from the warrant which are pertinent to the issues raised in

16  this motion (Exhibit C); and (4) a  Memorandum of Interview prepared by Inspector Esteban

17  memorializing Mr. Iannetti's interrogation. (Exhibit D ).

18

19                              **SUMMARY OF ARGUMENT**

20       Mr. Iannetti's statements to Greenspan and Esteban should be suppressed because he  was

21  in custody during his interrogation and he was not advised of the warnings provided required by

22  *Miranda v. Arizona,* 384 U.S. 436 (1966).

23

24

25

26

27   _____

     [2]

28

Motion To Suppress Statements

1

2

3

**ARGUMENT**

4
5

**MR. IANNETTI'S STATEMENTS SHOULD BE SUPPRESSED BECAUSE HE WAS SUBJECTED TO A CUSTODIAL INTERROGATION AND NOT ADVISED OF HIS MIRANDA RIGHTS**

6

**I.  MR. IANNETTI WAS NOT ADVISED OF HIS MIRANDA RIGHTS**

7     On February 20, 2008 Mr. Iannetti was subjected to three hour and forty minute custodial

8   interrogation by postal agents Greenspan and Esteban. He was not advised of his *Miranda* right

9   either before or during that interrogation. In *Miranda v. Arizona*, 384 U.S. 436, 86 (1966)*,* the

10  Supreme Court held that certain warnings must be given before a suspect's statement made

11  during custodial interrogation can be admitted in evidence. Thus, all statements made during that

12  interrogation be suppressed.

13
14

**II.  INTERROGATIONS CONDUCTED IN A POLICE DOMINATED ATMOSPHERE ARE CUSTODIAL INTERROGATIONS**

15  *Miranda* warnings are required "only where there has been such a restriction on a person's

16  freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  "'To

17  determine whether an individual was in custody, a court must, after examining all of the

18  circumstances surrounding the interrogation, decide whether there [was] a formal arrest of

19  restraint on freedom of movement of the degree associated with a formal arrest.'" *United States*

20  *v. Bassignani*, 560 F.3d 989, 984 (9th Circ. 2009)(quoting *United States v. Kim*, 292 F.3d 969,

21  973 (9th Cir. 2002)). It requires that a reasonable person would not "have felt he or she was not at

22  liberty to terminate the interrogation and leave," given the totality of the circumstances.

23  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)**.**

24     The Ninth Circuit has developed a number of factors for determining whether an

25  individual was in custody at the time he was interrogated by government agents.  In *United States*

26  *v. Kim*, 292 F.3d 969 (9th Cir.  2002),  the interrogation took place in the suspect's place of

27  business during the execution of a search warrant. The court outlined a five factor test for

28

Motion To Suppress Statements

CR 09-0850 VRW                              4

1    determining whether Kim was in custody during the interrogation: (1) the language used to

2    summon the individual; (2) the extent to which the defendant is confronted with evidence of

3    guilt;(3) the physical surroundings of the interrogation;(4) the duration of the detention; and (5)

4    the degree of pressure applied to detain the individual. Id. 292 F.3d at 974.

5         In *United States v. Craighead,* 593 F.3d 1073 (9th Cir. 2008), the interrogation took place

6    in the suspect's home during the execution of a search warrant. The court outlined a four factor

7    test for determining whether Craighead was in custody during the time he was questioned: (1) the

8    number of law enforcement personnel and whether they were armed; (2) whether the suspect was

9    at any point restrained, either by physical force or threats; (3) whether the suspect was isolated

10   from others; and (4) whether the suspect was informed that he was free to leave or terminate the

11   interview, and the context in which any such statements were made. Id. 593 F.3d at 1084.

12        In both *Kim* and *Craighead* the ultimate inquiry was focused on the extent to which the

13   circumstances of the interrogation turned the location of the interrogation into a "police

14   dominated atmosphere" where the suspect would have reasonably felt compelled to stay and

15   answer the agents questions. *See Kim,* 292 F.3d at 977; *Craighead,* 593 F.3d. at 1083.  As

16   discussed *infra* application of the *Kim* and *Craighead* factors to the totality of the circumstances

17   surrounding the interrogation of Mr. Iannetti leads to the inescapable conclusion that it was

18   conducted in a "police dominated" atmosphere and that Mr. Iannetti  reasonably felt he that he

19   had no choice but to stay and answer Greenspan's questions.

20

21        **III.  MR. IANNETTI'S INTERROGATION TOOK PLACE  IN A "POLICE**
           **DOMINATED ATMOSPHERE"**
22

23        **A.  MR. IANNETTI WAS COMMANDED TO COME TO THE GALLERY**

24         The words used by Inspector Greenspan to summon Mr. Iannetti to his gallery weighs in

25   favor of a conclusion that he was in custody during his interrogation.  Approximately two hours

26   after the agents began executing the search warrant[3] Greenspan called Mr. Iannetti at home and

27   _____

28        [3]  Agents entered and took control of  the gallery shortly after 10:00 a.m.(Exhibit   )

Motion To Suppress Statements

1   asked him "do you know me?"  When Mr. Iannetti asked him who he was Greenspan  identified

2   himself as a federal p postal inspector, and told him " I am at your gallery and you better come

3   here as soon as you can". Greenspan also told Mr. Iannetti that the door to the gallery would be

4   locked, that he would have to knock on the door to gain entry, and that he should bring some

5   form of identification with him. **(**Exhibit A  **)**

6       Mr. Iannetti arrived at the gallery at approximately 1:00 p.m.  He  knocked on the door as

7   instructed and was met by Greenspan who asked him if he "remembered him now".  After

8   indicating he remembered Greenspan as the person who bought a Miro print in December for his

9   boyfriend in Chicago he was directed to follow Greenspan into the gallery.  He then followed

10  Greenspan through a crowd of agents, some of whom appeared to be armed, who were searching

11  through the gallery and taking photographs.  As they walked through the gallery Greenspan told

12  him that they had a federal warrant to search his gallery. When they arrived at the rear of the

13  gallery they were met by Esteban.  Iannetti was then ushered into "the viewing room" at which

14  time either Esteban closed the door and asked him to sit down. Greenspan sat on a couch to his

15  left and Esteban stood and then eventually sat between him and the only exit from the room.

16  **(**Exhibit A **)**

17       The use of language similar to that used by Greenspan to summon an individual to an

18  interrogation has been found to amount to a command.  In *United States v. Brobst*, 558  F.3d

19  982, 995 (9th Cir. 2009),  the words "'you need to come with me' or words to that effect"

20  weighed in favor of a conclusion that Brobst was in custody.  Id. at 995.   Under the foregoing

21  circumstances it cannot be said that Mr. Iannetti "voluntarily" agreed to come to the gallery or

22  that his encounter with the postal agents was "consensual".  This factors weighs heavily in favor

23  of a finding that Mr. Iannetti was in custody  during his interrogation.

24      **B.  DURATION OF THE INTERROGATION**

25       According to Esteban's Memorandum of Interview Mr. Iannetti was interrogated for three

26  hours and forty minutes. (Exhibit D)  In *Kim, supra,* the court found that a 50 minute

27  interrogation at the defendant's place of business was "a full-fledged interrogation, not a brief

28

1    inquiry" *Id.* 292 F.3d at 977  In *Craighead* a 30 minute interrogation was found to be custodial.

2    *Id*. 593 F.3d at 1078.  The length of Mr. Iannetti's interrogation  weighs heavily in favor of a

3    finding that he was in custody.

### C.  MR. IANNETTI WAS CONFRONTED WITH EVIDENCE OF GUILT AND SUBJECTED TO ACCUSATORY QUESTIONING

6          Mr. Iannetti confronted with evidence of guilt before and immediately after  the

7    interrogation began.  Shortly after entering the viewing room Mr. Iannetti was asked to review

8    the search warrant and attachments, both of which contained information implicating him in the

9    sale of counterfeit Miro prints.  Shortly after the actual  questioning began the interrogation

10   turned accusatory. Mr. Iannetti was accused of lying to Greenspan and he was confronted with

11   other evidence suggesting he was guilty of selling fake Miro's.

12         The Ninth Circuit has found that a defendant is in custody where an interrogator adopts

13   an aggressive, coercive, and deceptive tone. *United States v. Bassagnani*, 560 F.3d 989, 994-995

14   (9th Cir. 2009).)  In  *United States v. Beraun-Panez*, 812 F.2d 578, 579 (9th Cir. 1987),  the court

15   found  that the fact that  officers demanded to know why Beraun-Panez  was lying and said they

16   knew the truth was found to mitigate in favor of a finding that the interrogation was custodial.  In

17   *United States v.Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985), the court noted that " [t]he

18   questioning progressed for over an hour and turned accusatory - Waunkea was told that he

19   supplied information that only the perpetrator could know, that he matched the description of the

20   rapist, and that he had better tell the truth."   In *United States v. Brobst*, *supra*,  558  F.3d  982,

21   995 (9th Cir. 2009),  the defendant and a friend arrived at his home while the officers were

22   executing a search warrant. Brobst was ordered to accompany one of the officers into the

23   residence where he was told that  the officers had a search warrant for the residence and provided

24   him with a copy of it. He was then confronted with the fact that they had found child

25   pornography in his bedroom and asked him if it was his.  He then admitted it was. Id.  at 988-

26   989.)  The court held that because Brobst  was immediately confronted with evidence of the

27   child pornography along with the manner in which he was confronted weighed in favor of a

28

Motion To Suppress Statements

1  finding Brobst was in custody. Id. at 995.

2       When Mr. Iannetti was first isolated in the viewing room he was asked to review the

3  search warrant and attachments  The body of the warrant contained information which implicated

4  Mr. Iannetti in the sale of counterfeit Miro prints he had purchased from Elio Bonfiglioli.  It

5  specifically referred to the "Quatre Colors Aparien" print Mr. Iannetti had sold to Greenspan on

6  December 24, 2007 and authorized the seizure of all other Miro art prints found in the gallery, all

7  records relating to Mr. Iannetti's dealings with Elio Bonfiglioli, all of Mr. Iannetti's business and

8  inventory records relating to the sale of Miro art works from January 1, 2001 to the present, all

9  reference books related to Miro, and all computers located at the gallery. (Exhibits A and C)

10      The attachments to the search warrant reviewed by Mr. Iannetti contained, among other

11  items, (a) seven undercover photographs showing a meeting between Bonfiglioli and another

12  person who is seen to be signing a Miro print identical to the one Iannetti sold to Greenspan; (b)

13  the sales invoice, certificate of authenticity and other documents  issued to Greenspan in

14  connection with that sale and; (c) a consignment contract between Iannetti and Bonfiglioli

15  regarding eight Miro works purchased by Iannetti in March of 2007. (Exhibit C)

16      Immediately after Mr. Iannetti  finished his review of the warrant and attachments the

17  interrogation began. He was immediately questioned about his relationship with Bonfiglioli. One

18  of the first questions asked was when he had last met with Bonfiglioli. When Mr. Iannetti told

19  Greenspan that he had last seen him in April of 2007 Greenspan  confronted him in an  angry and

20  hostile manner and accused him of  "lying".  He told Iannetti they knew he was lying because

21  they had surveillance of Mr. Iannetti  meeting with Bonfiglioli at the gallery in November and

22  they knew that was when Iannetti obtained a number of prints from him including the print he

23  had sold to Greenspan in December . (Exhibit A)  Esteban's memorandum confirms that  " we . .

24  . confronted Iannetti about Bonfiglioli's actual visit to San Francisco in November 2007. . .  We

25  told Iannetti that we knew Bonfiglioli was in San Francisco last year and that he and Bonfiglioli

26  met with each other on November 9th and 10th in San Francisco in 2007, and that Iannetti

27  received those art prints  at that time." (Exhibit D at p.2)  It is significant to note that "those art

28

Motion To Suppress Statements

CR 09-0850 VRW                                    8

1  prints" included the same "Quatre Colors Aparien" sold to Greenspan (Parks) in December 2007
2  and depicted in the undercover photographs attached to the warrant.

3  Mr. Iannetti states that after he apologized for "misremembering" the date he last met
4  with Bonfiglioli he was angrily confronted by Greenspan who told him he was in serious trouble
5  and that he had better tell the truth. Greenspan was acting very agitated and aggressive. He
6  compared Iannetti's situation to that of Barry Bonds in the Balco case. He told Iannetti that
7  Bonds had also lied to federal agents and was now looking a federal jail time. He also told
8  Iannetti that the "Quatre Colors Aparien El Mon" print he had sold to him in December had been
9  examined by an art expert who determined that it was a low quality fake. Greenspan then
10 indicated that if Iannetti continued to lie the prosecutor and the judge would not be very
11 sympathetic towards him and while they were not making any promises to him things would be
12 turn out better for if he cooperated. (Exhibit A)

13 Not surprisingly Esteban describes this portion of the interrogation in more antiseptic
14 terms: "we advised Iannetti that it was in his best interest to be truth ful with us and that we were
15 not making any promises to him. **. . . .** We advised Iannetti about our undercover purchase . . . of
16 "Quatre Colors Aparien el Mon" on December 24. We told Iannetti that the art print was
17 examined by an art expert and deemed to be a low quality fake. (Exhibit D at p. 2 )

18 The initial questioning of Mr. Iannetti has all of the attributes of a well designed and
19 thought out plan to extract a confession by the use classic police interrogation techniques. He
20 was isolated in a room with two agents while other agents searched his gallery. He was instructed
21 to review a warrant and attachments which clearly tied him to the sale of counterfeit Miro prints.
22 He was first asked about his relationship with Bonfiglioli and early on was asked when they had
23 last met, a question obviously asked in the hope that he would give them a date different than
24 November 9th or 10th.  When he did they confronted him with their undercover surveillance on
25 those dates, accused him of lying, essentially indicated that they already knew he was guilty of
26 selling "low quality" fake Miro's, and that his best and only course of action was to admit his
27 guilt.

28

1    Mr. Iannetti was clearly confronted with evidence of his guilt before immediately before

2    and at the inception of an interrogation that quickly turned hostile and accusatory.  According to

3    *Beraun-Panez*, *Wauneka*, and *Brobst*, *supra,* this factor weighs heavily in favor of a finding that

4    Mr. Iannetti was in custody during his interrogation.

5

6    **D.  THE AGENTS EXERCISED COMPLETE CONTROL OVER MR. IANNETTI AND HIS GALLERY**

7    By exercising complete control over Mr. Iannetti and his place of business the agents

8    created a "police dominated atmosphere" which negated the fact that the interrogation took place

9    in  familiar surroundings. Mr. Iannetti was told by Greenspan over the telephone that when he

10   arrived at the gallery the door would be locked and that he would have to knock on the door and

11   provide identification in order to gain entry. When he arrived at the gallery it was full of

12   searching agents.  Once he entered the gallery Greenspan walked him to the back of the gallery

13   and ushered him into the viewing room where he was isolated from any employees who may

14   have been on the premises. When his wife arrived at the gallery she was told to go away.  She

15   was allowed to remain only after she let herself in with a key and refused to leave. Finally, on the

16   two occasions Mr. Iannetti left the viewing room he was accompanied and monitored by one of

17   the agents.

18   Although an interrogation conducted in familiar surroundings may be found to weigh

19   against a finding that the defendant was in custody[4] the Ninth Circuit has recognized that the

20   consideration of the familiarity of the physical surroundings in the custodial interrogation context

21   may be neutralized where law enforcement officers take complete control over the environment

22   and create "a police-dominated atmosphere." *United States v. Brobst*, 558 F.3d 982 (9th Cir.

23   2009);  *United States v. Craighead*, 539 F.3d 1073 (9th Cir 2008); *United States v. Kim*, 292 F.3d

24   969 (9th Cir. 2002);  *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982).

25   A number of factors are considered when determining whether the police have taken

26

27   _____

28   [4]  *See Beckwith v. United States*, 425 U.S. 341, 346-48 (1976)

Motion To Suppress Statements

CR 09-0850 VRW                              10

"complete control" over the location where the interrogation was conducted:  (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Craighead*, *supra,* 593 F.3d at 1084.  An analysis of each of the first three factors in light of  the facts of this case heavily mitigate in favor of finding that Mr. Iannetti's interrogation took place in a "police dominated atmosphere"[5]:

**Number of Agents**

There were at least eight agents involved in the search of Mr. Iannetti's gallery. When Mr. Iannetti entered the gallery it was crowded with law enforcement agents who were taking photographs or videos, going through his business records, and examining various works of art. Some appeared to be armed and most appeared to have law enforcement  badges/identification hanging from their neck.   In *Craighead*, *supra*, the court found that "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere" and cited cases involving eight, seven, and five officers as examples of what it meant by a large number of officers. ( 539 F.3d at 1085.) The eight or more agents involved in the execution of the search warrant herein certainly contributed to making the Iannetti's gallery a police dominated atmosphere.

**Mr. Iannetti Was Restrained**

Although Mr. Iannetti was not physically restrained he reasonably felt he was subject to police domination. First, as discussed above Mr. Iannetti was commanded to leave his home and come to the gallery. When he got there the door was locked and he had to knock in order to gain entry. He  there was directed to follow Greenspan into viewing room at which time the door was closed. During the entire time he was in the viewing room Esteban sat between him and the door.

---

[5]  The fourth factor will be discussed under a separate heading , *infra.*

On the two occasions he was allowed to leave the viewing room he was accompanied and monitored by an agent. When he was allowed to leave the room to go to the bathroom an agent walked him to the bathroom and stood outside the bathroom door.  The agent appeared to be concerned about the amount of time he was taking and knocked on the door two or three times and asked him if he was  "all right".  When Iannetti left the bathroom the agent walked him back to the viewing room. At the conclusion of the interrogation Esteban accompanied Iannetti while he identified Miro prints he had purchased from Bonfiglioli. (Exhibit A )

In *Craighead***,** the court pointed out that the restraint may be accomplished without threatening or handcuffing a suspect:

> Restraint amounting to custody may also be inferred where law enforcement
> officers permit the suspect to move around the house for brief periods but insist
> on escorting and monitoring him at all times. See *Mittel-Carey,* 493 F.3d at 40
> (finding an interrogation custodial where the suspect was escorted by agents on
> the three occasions that he was permitted to leave the interrogation space,
> including while he used the bathroom); *Griffin,* 922 F.2d at 1350-51 ("We realize
> that the likely effect on a suspect of being placed under guard during questioning,
> or told to remain in the sight of interrogating officials, is to associate these
> restraints with a formal arrest.") (539 F.3d at 1085-1086.)

Mr. Iannetti was clearly restrained with in the meaning of *Craighead*, *Mittel-Carey*, and *Griffin*, *supra*. Like the defendant in *Craighead* he was escorted by agents to the room where the interrogation took place and the only way out was a closed door which was blocked by an agent. Like the defendant in *Mittel-Carey* on each occasion that he left the interrogation room he was escorted and monitored by an agent.

**Mr. Iannetti Was Kept Isolated From His Wife and Employees**

Mr. Iannetti was kept isolated from his wife and at least one employee while he was interrogated in the viewing room.  In *Craighead* the court pointed out: "A frequently recurring

1   example of police domination concerns the removal of the suspect from the presence of family,

2   friend, or colleagues who might lend moral support during the questioning and deter a suspect

3   from making inculpatory statements . . ." Id. 539 F.3d at 1987.  In *Beraun-Panez*, *supra*, the

4   court held that by "keeping [the defendant] isolated from other people, the officers contributed to

5   the custodial nature of the interrogation".  Id. 812 F.2d at 581.

6        When Mr. Iannetti arrived at the gallery employee Margaret Aiken was being interviewed

7   by agents Zemblidge and Morris and it appears that her interrogation concluded one hour and ten

8   minutes after Mr. Iannetti's interrogation began.  Assuming she left immediately after her

9   interrogation it appears that Mr. Iannetti was isolated from at least one of his employees for a

10  period of an hour or so.

11       More importantly, the agents kept Mr. Iannetti isolated from his wife when she came to

12  the gallery to see him. Elena Iannetti arrived at the gallery around 3:00 or 3:30 and found that the

13  door was locked and the gallery full of people she did not recognize. She knocked on the door

14  repeatedly until an agent opened the door. She told him she was Iannetti's wife and asked him

15  what was going on and whether Pasquale was there. The agent told her that the gallery was

16  closed and to go away. He then shut the door in her face. She remained at the front door crying

17  for a few minutes and unsuccessfully attempted to obtain help from a lawyer. At this point she

18  became even more agitated  and decided to unlock the door and go in anyway. When she entered

19  the gallery another agent rushed up to her and pushed her back towards the front door to keep her

20  from going to the back of the gallery. She  became extremely hysterical at this point and started

21  screaming that she wasn't going to leave until she saw her husband. At this point agent

22  Greenspan walked out of the viewing room with Mr. Iannetti.and allowed him to calm her down.

23  When she still refused to leave she was allowed to sit in the gallery with agent by her side.

24  Significantly, Mr. Iannetti's was returned to the viewing room and his interrogation continued for

25  an hour or more. (Exhibit B)

26       In *United States v. Kim*, *supra,* and *United States v. Brobst, supra,* the Ninth Circuit

27  concluded under facts similar to the instant case that the familiarity of the surroundings were

28

1   negated because of the degree to which the police isolated the defendants and dominated the

2   scene.

3       In *Kim* the interrogation took place at the defendant's place of business . When she

4   arrived at her store with her husband the police were in the store executing a search warrant.

5   They allowed her into the store, but locked the door behind her leaving her husband outside.

6   Once inside the store she was kept isolated from son who had been in the store at the time the

7   police entered. The court found that "isolating the defendant from the outside world - *here from*

8   *her husband who had tried to join her in the shop - largely neutralizes the familiarity of the*

9   *location as a factor undermining coercion."* Id. 292 F.3d at 977. Emphasis added.

10      In *Brobst*, *supra*, the police had a warrant to search Brobst's residence for pornography.

11  When Brobst"arrived at his residence, three officers were already there. Two of the officers were

12  searching the inside of the residence, and another was outside the residence, waiting, in part, for

13  Brobst's return.  Immediately upon Brobst's arrival, this officer approached Brobst and told him

14  to follow him into the house where he was provided with a copy of the search warrant and told

15  that they had found pornography.  The same officer then questioned him about the pornography. .

16  Id. 558  F.3d at p. 995-996.

17      As in both *Kim and Bobst,* when Mr. Iannetti arrived at the gallery the agents were

18  already executing the warrant had control of the premises. As in *Brobst*  Iannetti was told by

19  Greenspan to follow him into the gallery where he was confronted with evidence of his guilt and

20  interrogated in a closed room.  He was also isolated from the one employee who was present

21  when he arrived at the gallery. As in *Kim,* Iannetti's wife was locked out of the gallery and even

22  after she forced her way in she was kept guarded and isolated from him . Finally, one

23  dissimilarity between *Kim* and the instant case weighs heavily in Mr. Iannetti's favor.  In *Kim* the

24  court noted that the fact that Kim was not summoned to her place of business mitigated against a

25  finding of coercion.  In the instant case the contrary is true.  Mr. Iannetti *was* called at home by

26  Greenspan and told he had better come down to the gallery. Under these circumstances the

27  familiarity of the physical surroundings in which Mr. Iannetti's interrogation was conducted were

28

1    clearly neutralized.

2

3    **E.  MR. IANNETTI REASONABLY FELT HE WAS NOT FREE TO**
     **LEAVE THE GALLERY**

4

5         Mr. Iannetti reasonably felt that he was not free to leave the gallery despite being told by

6    the agents that they did not come to his gallery to shut down his business or arrest him. **(**Exhibit

7    A)

8         In *Craighead*, *supra*, the court pointed out that "[t]he mere recitation of the statement that

9    the suspect is free to leave or terminate the interview . . . does not render an interrogation non-

10   custodial *per se.* We must consider the delivery of these statements within the context of the

11   scene as a whole . . . The *Miranda* test for custody does not ask whether the suspect was *told* that

12   he was free to leave; the test asks whether 'a reasonable person would have *felt* he or she was not

13   at liberty to terminate the interrogation and leave." (emphasis added in original)." *Craighead*,

14   *supra*, at 1088, quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

15        The conduct of that agents herein appears to have been guided by a desire to obtain Mr.

16   Iannetti's presence at the gallery for the purpose of obtaining a confession that he knowingly sold

17   counterfeit Miro art prints. This is not a case where a suspect happened to be at his place of

18   business when the police arrived to execute a search warrant. Nor is this a case where a suspect

19   upon learning that the police were executing a search warrant at his or her place of business

20   voluntarily went there to inquire why the premises were being searched or to check on the

21   welfare of his employees or the condition of the premises. In this case the agents began searching

22   the gallery at approximately 10:00 a.m. in the morning.  For the next two hours they interviewed

23   employees and searched through art works and business records. After approximately two hours

24   of searching Greenspan then called Mr. Iannetti on the phone, identified himself as a federal

25   agent, and told Mr. Iannetti that he was at his gallery that he "better come to the gallery right

26   away". (Exhibit A)  He did not tell Mr. Iannetti why he wanted him to come to the gallery.  He

27   did not advise him that he wanted to question him about the authenticity of Miro art prints that he

28

1   was selling at his gallery or his relationship with Elio Bonfiglioli.  Mr. Iannetti did not learn that

2   Greenspan was executing  a search warrant until he arrive at the gallery and they were walking

3   back to the viewing room. (Exhibit A)

4        When Mr. Iannetti arrived at the gallery the door was locked and entry was controlled by

5   the postal inspectors. The gallery was filled with numerous agents some of whom appeared to be

6   armed. Mr. Iannetti was ushered into a room in the back of the gallery and the door was closed.

7   Through the glass doors of the room he could see that the agents were busily searching the

8   gallery and taking photographs. Mr. Iannetti's employees were nowhere to be seen. He was asked

9   to sit down and  review of the warrant and attachments. This review revealed that a Miro print he

10  had bought from Elio Bonfiglioli in November and sold to Greenspan in December was

11  apparently a counterfeit. When he finished reviewing the warrant  he was told that the agents

12  were not there to arrest him or shut down his business, however they then began to question him

13  regarding his relationship with Elio Bonfiglioli. The questioning quickly turned hostile,

14  aggressive, and accusatory. (Exhibit A)  Although not handcuffed by the agents Mr. Iannetti was

15  essentially locked in a room with them and subjected  to psychological restraints just as binding.

16  He was accused of lying about when he last saw Bonfiglioli and told that he had sold a low

17  quality fake Miro to Greenspan in a sting operation in December. Greenspan compared his

18  situation with that of  Barry Bonds who had lied to federal agents about his use of steroids and

19  was facing federal jail time. He was angrily told that he had better cooperate with them although

20  they weren't making him any promises. (Exhibit A)  Under these circumstances would a

21  reasonable person still feel that the agents were not there to arrest him and/or shut down his

22  business?  The answer is no.  Under the totality of the circumstances herein a reasonable person

23  would feel that he had no choice but to remain and answer Greenspan's questions.

24       For the sake of argument only, even if the court were to somehow consider the beginning

25  of Mr. Iannetti's interrogation "voluntary", there can be no doubt that it quickly turned custodial.

26  As the questioning progressed a reasonable person in Mr. Iannetti's circumstances would have

27  been compelled to stay in the room and answer Greenspan's questions. (*See United States v.*

28

Motion To Suppress Statements

CR 09-0850 VRW                                   16

1    *Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir. 1987); *Kim,*

2    *supra*, 292 F.3d at 973.)

3           The Ninth Circuit has found that coercive and manipulative questioning techniques

4    similar to those utilized in the instant case can create a situation where a reasonable person would

5    not feel free to leave even though he was told at the beginning of the interrogation that he was

6    free to leave at any time.  In *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982),  the defendant

7    was asked if he would agree to be interviewed in the FBI car which was parked in front of his

8    house. When Lee entered the vehicle with two agents he was told that he was free to leave the car

9    or terminate the interview at anytime. At the beginning of the interview the police allowed him

10   "to repeat his exculpatory story and then confronted him with evidence of his guilt and told him

11   it was time to tell the truth .. ."   The Ninth Circuit held that in "such circumstances a reasonable

12   innocent person would not feel free to leave".(*Id.* at 468.)  This is exactly the approach that

13   Greenspan and Esteban took with Iannetti. They knew he was not aware that they had surveilled

14   his meetings with Bonfiglioli on November 8th and 9th and hoped to catch him in a lie when they

15   asked him when he had last met with Bonfiglioli. When Iannetti told them he last saw Bonfiglioli

16   in April the trap was sprung and they were able to "confront" him and "advise him that it was in

17   his best interest to tell the truth". (Exhibit ) Under these circumstances Iannetti reasonably

18   believed he was not free to leave.   Additionally, as the interrogation progressed the fact that

19   Iannetti  was only allowed to use the bathroom with a police escort and the fact that he was only

20   allowed to see his wife, and then briefly, when she forced her way into the gallery,  could only

21   have reinforced the reasonable conclusion that he was not free to leave.

22   **F. THE TOTALITY OF THE CIRCUMSTANCES OVERWHELMINGLY**
     **SUPPORT A FINDING THAT  IANNETTI  WAS IN CUSTODY AT THE**
23   **TIME HE MADE HIS STATEMENTS TO THE  POSTAL AGENTS**

24          Viewing the totality of the circumstances surrounding Mr. Iannetti's interrogation it is

25   clear that he was in custody from the moment he left his residence. In *Kim, supra* court pointed

26   out that to determine whether an individual was in custody must examine the totality

27   circumstances surrounding the interrogation. *Kim, supra,* 292 F.3d at 973.  Such examinations

28

Motion To Suppress Statements

CR 09-0850 VRW                              17

1    are necessarily fact intensive. *Craighead. supra,* 539 F.3d 1084.

2        The facts in this case are heavily weighted that the interrogation herein was a "custodial

3 interrogation".  Mr. Iannetti did not voluntarily come the to the gallery.  He was commanded to

4 do so by inspector Greenspan. When he arrived at the gallery it was completely under the control

5 of at least eight law enforcement agents and he had to knock to gain entry. His employees were

6 no where to be seen.  He was ordered into the viewing room where he was immediately

7 confronted with evidence of his guilt and interrogated for over three hours in an accusatory and

8 threatening manner.  He not allowed to leave the room unless accompanied by an agent and was

9 isolated from his wife and employees thus neutralizing any amelioritive effect due to the

10 familiarity of the surroundings. And finally, he  reasonably felt that he was not free to leave the

11 gallery despite being told by the agents that they did not come to his gallery to shut down his

12 business or arrest him.

13      **IV.  CONCLUSION**

14        For the reasons set forth above Mr. Iannetti respectfully requests that the Court grant his

15 motion, and accord other relief as it deems just.

16

17 Dated: February 23, 2010               Respectfully submitted,

18                                        _____/s/_____

19                                        Alan A. Dressler
                                       Attorney for Defendant
                                       Pasquale Iannetti

20

21

22

23

24

25

26

27

28