Alan A. Dressler, Esq. (SBN 56916)
400 Montgomery St., Ste 200
San Francisco, CA 94104
Tel.  (415) 421-7980
Fax  (415) 421-7021
E-Mail: alandressler@aol.com

Attorney for Defendant
Pasquale Iannetti

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09-0850 VRW |
| Plaintiff, | **DEFENDANT  IANNETTI'S NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| PASQUALE IANNETTI, | |
| Defendant. | Date:   May 13, 2010 |
| | Time:   2:00 p.m. |
| | Judge:   Hon. Vaughn  R. Walker |

TO: JOSEPH P. RUSSONIELLO, United States Attorney
     SUSAN BADGER, Assistant United States Attorney

        PLEASE TAKE NOTICE that defendant  Pasquale Iannetti  moves this Court for an order

suppressing as evidence all purported statements obtained during his interrogation by United

States Postal Inspectors on February 20, 2008.

        This motion is made on the ground that the statements were taken in violation of Mr.

Iannetti's constitutional right to remain silent, and to due process under the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution, Fed. R. Crim. P., Fed. R. Evid., and

all other applicable statutes.

Dated:  March 19, 2010                                   Respectfully submitted,


                                                    _____/s/_____
                                                    Alan A. Dressler
                                                    Attorney for Defendant
                                                    Pasquale Iannetti

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**TABLE OF CONTENTS**

3   STATEMENT OF FACTS                                                          4

4   ISSUE TO BE DECIDED                                                         7

5   ARGUMENT

6      I.  MR. IANNETTI WAS NOT GIVEN *MIRANDA* WARNINGS . . . . . . . . . . . .  7

7

8     II.  INTERROGATIONS CONDUCTED IN A "POLICE DOMINATED
            ATMOSPHERE" ARE CUSTODIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

9    III.  MR. IANNETTI WAS INTERROGATED IN A "POLICE
            DOMINATED ATMOSPHERE" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

10

11     A.  GREENSPAN COMMANDED IANNETTI TO COME
           TO THE GALLERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

12     B.  THE INTERROGATION WAS LENGTHY . . . . . . . . . . . . . . . . . . . . . . . . . 10

13     C.  MR. IANNETTI WAS SUBJECTED TO ACCUSATORY
           QUESTIONING AND CONFRONTED WITH EVIDENCE
14         OF GUILT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15     D.  THE AGENTS EXERCISED COMPLETE CONTROL OVER
           MR. IANNETTI'S ART GALLERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

16

17     E.  A REASONABLE PERSON WOULD NOT HAVE FELT
           FREE TO LEAVE THE GALLERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18

19     F. THE TOTALITY OF THE CIRCUMSTANCES ESTABLISH
         THAT MR. IANNETTI WAS IN CUSTODY AT THE TIME
20       HE MADE HIS STATEMENTS TO THE POSTAL AGENTS . . . . . . . . . . . . 21

21  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

*Beckwith v. United States*,
425 U.S. 341(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Miranda v. Arizona*,
384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Oregon v. Mathiason*,
429 U.S. 492 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Thompson v. Keohane*,
516 U.S. 99 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 19

*United States v. Bassagnani*,
 560 F.3d 989 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*United States v. Beraun-Panez*,
812 F.2d 578 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 20

*United States v. Brobst*,
558  F.3d  982 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 14

*United States v. Craighead,*
593 F.3d 1073 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 15, 18, 19

*United States v. Griffin,*
 922 F.2d 1343 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

*United States v. Kim,*
 292 F.3d 969 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 14, 17, 20

*United States v. Lee,*
699 F.2d 466 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

*United States v.  Mittel-Carey,*
493 F.3d 36 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Wauneka,*
770 F.2d 1434 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14

### STATEMENT OF FACTS[1]

Mr. Iannetti is charged with numerous counts of mail and wire fraud based on the alleged sale of counterfeit art prints.  During the period covered by the indictment he was the owner of the Pasquale Iannetti Art Gallery located at 565 Sutter Street in San Francisco, California.  Mr. Iannetti seeks the suppression of statements made to agents of the United States Postal Service on February 20, 2008.  These statements were made during an interrogation which took place at Mr. Iannetti's gallery while postal inspectors were executing a search warrant for counterfeit art prints and business records. Mr. Iannetti was not given *Miranda* warnings either before or during the interrogation.(Exhibit E[2])

In early November of 2007 Elio Bonfiglioli entered the United States with a number of art prints purportedly created and signed by the artist Joan Miro. He eventually made his way to San Francisco, California where he allegedly sold one or more of those prints, including one entitled  "Quatre Colors Aparien El Mon" ("Quatre Colors"),  to Mr. Iannetti.  (Exhibit D[3] at ¶ 4.a.)

On December 24, 2007, postal inspector Marius Greenspan (Greenspan), acting in an undercover capacity, purchased a  "Quatre Colors" print from Mr. Iannetti's gallery.  On January 23, 2008, this print was examined by an art expert who opined that it was a counterfeit.  (Exhibit D at ¶ 4.b.)

On February 20, 2008 at about 10:10 a.m., Greenspan, and at least seven other postal inspectors, entered Mr. Iannetti's gallery for the purpose of executing a search warrant which authorized the seizure of all Miro prints in the gallery and certain business records. (Exhibit D at

---

[1] This Statement of Facts stems in part from portions of a Search Warrant  and a Memorandum of Interview which purports to memorialize Mr. Iannetti's statements during an interrogation by postal agents. Mr. Iannetti does not adopt the statements set forth in those documents (Exhibits B and E) and reserves the right to contest those statements at hearing or trial.

[2] "Memorandum of Interview" prepared by Esteban.

[3] Declaration of Alan Dressler, submitted herewith.

¶ 4.c.)  Mr. Iannetti was not present at this time. Approximately two hours after the postal inspectors began their search of the gallery Greenspan contacted Mr. Iannetti by telephone.  Mr. Iannetti was at home when he received this call. Greenspan identified himself as a federal agent and told Iannetti that he was at his gallery and that Iannetti should come there as soon as he could. Greenspan also told him that the door to the gallery would be locked and that he would have to knock on the door to gain entry. He was also told to bring proof of identification with him. ( A[4] at ¶) 3.-4.)

When Mr. Iannetti arrived at the gallery the door was locked and the gallery was crowed with agents. After knocking on the door he was greeted by Greenspan and directed to follow him to the back of the gallery where they were joined by postal  inspector Patrick Esteban (Esteban). Iannetti was then instructed to follow Esteban and Greenspan into a room  known as the "viewing room." (Exhibit A at ¶ 4.-6.)  After Mr. Iannetti had taken a seat Greenspan  told him they had a search warrant, that he was being investigated for mail and wire fraud, and that he wanted to ask him some questions.  Mr. Iannetti was also told that the agents did  not come to the gallery to arrest him or shut his business down. He was also told, in an unfriendly and authoritative tone of voice, that he could leave if he wanted to do so. Given the overall situation Mr. Iannetti did not feel that he was really free to leave and agreed to answer some questions. (Exhibit A at ¶ 8.)

Mr. Iannetti was first asked to review the warrant and attachments. When  he did so he learned that it authorized the seizure of all Miro prints and lithographs located in the gallery, all business records relating to transactions between Iannetti and Bonfiglioli, and all business records relating to the sale of Miro prints between 2001 and February 20, 2008. The warrant described the items to be seized as "evidence" and "instrumentalities" of mail and wire fraud and specifically referred to the "Quatre Colors" series, one of which the Iannetti gallery sold to Greenspan in December of 2007.  While Mr. Iannetti was reviewing the warrant Greenspan pointed to the reference to "Quatre Colors" and said  "You remember this piece don't  you?"

---

[4] Declaration of Pasquale Iannetti, submitted herewith.

1    (Exhibit A at ¶ 9.)

2        When Iannetti  finished reviewing the warrant Greenspan immediately began asking him

3    questions about his relationship with Bonfiglioli. The questioning quickly turned hostile and

4    accusatory.  Iannetti was accused of lying, told that the agents "knew everything", and was

5    presented with evidence of his guilt. Greenspan also compared his situation with that of Barry

6    Bonds, told him that he was in serious trouble, and that things would be better for him if he

7    cooperated. (Exhibit A at ¶ 10.-11.)

8        The ensuing interrogation lasted for more than three and one-half hours. During this time

9    Iannetti was allowed to leave the room on two occasions. The first was when he requested to use

10   the bathroom.  Although this  request was granted he was accompanied to and from the bathroom

11   by a postal inspector who stood by the bathroom door while he was inside. (Exhibit A at ¶ 12.)

12       The second time Iannetti left the room occurred approximately two hours after the

13   interrogation began.  Sometime after 1:00 p.m. Mr. Iannetti's wife, Elena Iannetti, received a

14   telephone call from a gallery employee who told her that there were a lot of investigators at the

15   gallery. After unsuccessfully trying to contact Mr. Iannetti by telephone, she became concerned

16   and decided to go to the gallery. When she arrived at the gallery the door was locked and the

17   gallery was full of people she did not recognize.  After knocking on the door repeatedly it was

18   opened by an agent.  She identified herself as Mr. Iannetti's wife and asked if her husband was in

19   the gallery. The agent told her the gallery was closed and shut the door in her face.  She became

20   very upset and eventually let herself into the gallery with her husband's key. Upon entering she

21   was physically confronted by one of the agents. She became hysterical and shouted  that she

22   would not leave the gallery without her husband.  Shortly thereafter Greenspan and Mr. Iannetti

23   came out of the viewing room and Mr. Iannetti tried to calm her down.  When she still refused to

24   leave the agents agreed to let her remain, however, she was kept isolated from Mr. Iannetti until

25   the interrogation was completed. (Exhibit A at ¶ 13, Exhibit B[5]at ¶ 6.-10.)

26       At the conclusion of his interrogation Mr. Iannetti was told that the agents would not be

27

28        ───────────────
          [5] Declaration of Elena Iannetti, submitted herewith.

Motion To Suppress Statements
CR 09-0850 VRW                    6

1   finished searching the gallery until some time later in the evening.  The Iannetti's left the gallery

2   around 5:30/6:00 p.m. and returned around 6:30/7:00 p.m..  The postal agents completed their

3   search at 7:30 p.m., at which time Mr. and Mrs. Iannetti locked the door to the gallery and left.

4   (Exhibit D at ¶ 4.c.)

5                                    **ISSUE TO BE DECIDED**

6          Should Mr. Iannetti's statements to Esteban and Greenspan be suppressed as evidence in

7   this case?

8                                         **ARGUMENT**

9          **I.  MR.  IANNETTI WAS NOT GIVEN *MIRANDA* WARNINGS**

10         Mr. Iannetti was not given *Miranda* warnings before or during the interrogation

11  conducted by Greenspan and Esteban. (Exhibit E)  In  *Miranda v. Arizona*, 384 U.S. 436, 86

12  (1966), the Supreme Court held that "[T]he prosecution may not use statements, whether

13  exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

14  demonstrates the use of procedural safeguards effective to secure the privilege against self-

15  incrimination."

16         **II.  INTERROGATIONS CONDUCTED IN A POLICE DOMINATED**
17                  **ATMOSPHERE ARE CUSTODIAL**

18         *Miranda* warnings are required "only where there has been such a restriction on a person's

19  freedom as to render him 'in custody.'"  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  "To

20  determine whether an individual was in custody, a court must, after examining all of the

21  circumstances surrounding the interrogation, decide whether there [was] a formal arrest or

22  restraint on freedom of movement of the degree associated with a formal arrest."  *United States v.*

23  *Kim*, 292 F.3d 969, 973 (9th Cir. 2002)  "Two discrete inquiries are essential to the determination:

24  first, what were the circumstances surrounding the interrogation; and second, given those

25  circumstances, would a reasonable person have felt he or she was not at liberty to terminate the

26  interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (fn. omitted.)

27         The Ninth Circuit has identified a number of different factors to be used in determining

28

Motion To Suppress Statements
CR 09-0850 VRW                                        7

whether an individual was in custody at the time he or she  was interrogated by government

agents.  In *United States v. Kim*, *supra*, the interrogation took place during the execution of a

search warrant at the suspect's place of business.  The court outlined a five factor test for

determining whether Kim was in custody: (1) the language used to summon the individual; (2)

the extent to which the defendant is confronted with evidence of guilt; (3) the physical

surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure

applied to detain the individual. Id. 292 F.3d at 974.

In *United States v. Craighead,* 593 F.3d 1073 (9th Cir. 2008), the interrogation took place

during the execution of a search warrant at the defendant's home. The court outlined a four factor

test for determining whether Craighead was in custody: (1) the number of law enforcement

personnel and whether they were armed; (2) whether the suspect was at any point restrained,

either by physical force or threats; (3) whether the suspect was isolated from others; and (4)

whether the suspect was informed that he was free to leave or terminate the interview, and the

context in which any such statements were made.  Id. 593 F.3d at 1084.

In both *Kim* and *Craighead* the ultimate inquiry focused on the extent to which the

circumstances of the interrogation turned the location of the interrogation into a "police

dominated atmosphere" where the suspect would have reasonably felt compelled to stay and

answer the agents questions. *See Kim,* 292 F.3d at 977; *Craighead,* 593 F.3d. at 1083.

Application of the *Kim* and *Craighead* factors to the totality of the circumstances surrounding the

interrogation of Mr. Iannetti leads to the inescapable conclusion that it was conducted in a

"police dominated" atmosphere and that a reasonable person in Mr. Iannetti's situation would

have felt that he had no choice but to stay and answer Greenspan's questions.

///

///

///

///

### III.  MR. IANNETTI WAS INTERROGATED IN A "POLICE DOMINATED ATMOSPHERE"

### A.  GREENSPAN COMMANDED IANNETTI  TO COME TO THE GALLERY

The words used by Inspector Greenspan to summon Mr. Iannetti to the gallery mitigate in favor of a finding that he was in custody during his interrogation.  Approximately two hours after the agents began executing the search warrant[6] Greenspan called Mr. Iannetti at home and asked him "do you know me?".  When Mr. Iannetti said he did not recognize his voice Greenspan identified himself as a federal  postal inspector. He then told him that he was at the gallery and that Iannetti should " '. . . come here as soon as you can' or words to that effect." Greenspan also told Mr. Iannetti that the door to the gallery would be locked, that he would have to knock on the door to gain entry, and that he should bring some form of identification with him. (Exhibit A at ¶2.- 3.)

Mr. Iannetti arrived at the gallery at approximately 1:00 p.m.  He  knocked on the door as instructed and was met by Greenspan who asked him do you "remember . . .[me ] . . . now?". After indicating he remembered Greenspan as the person who bought a Miro print in December for his boyfriend in Chicago he was directed to follow Greenspan into the gallery.  He then followed Greenspan through a crowd of agents, some of whom appeared to be armed, who were searching the gallery. (Exhibit A at ¶ 5.) When they arrived at the rear of the gallery they were met by Esteban.  Iannetti was then ushered into the "viewing room" and the door was closed. Mr. Iannetti sat down on a chair and Greenspan sat on a couch to his left. Esteban stood and then eventually sat between Iannetti and the door, which was the only exit from the room.  (Exhibit A at ¶ 4.- 7.)

Language similar to that used by Greenspan to summon Mr. Iannetti to the gallery has been found sufficient to make a reasonable person feel that he was not at liberty to leave.  In *United States v. Brobst*, 558  F.3d  982, 995 (9th Cir. 2009), the defendant arrived at his home while police were executing a search warrant.  He was met outside the house by a police officer

---

[6]  The postal agents entered and took control of  the gallery at10:10 a.m.(Exhibit D at ¶ 4.c.)

who told him "'you need to come with me' or words to that effect" and directed him into the residence. The court held that this language weighed in favor of a conclusion that Brobst was in custody. Id. at 995.

In the instant case Mr. Iannetti was summarily ordered to leave his home and travel to his gallery. He was also told to bring his identification with him. This request, when coupled with the unfriendly command to appear at the gallery, would certainly have led a reasonable person to believe that he had no choice but to obey Greenspan's command.  Under the foregoing circumstances it cannot be said that Mr. Iannetti "voluntarily" agreed to come to the gallery or that his encounter with the postal agents was "consensual".  This factors weighs heavily in favor of a finding that Mr. Iannetti was in custody  during his interrogation.

## B.  THE INTERROGATION WAS LENGTHY

According to Esteban's Memorandum of Interview Mr. Iannetti was interrogated for three hours and forty minutes. (Exhibit E at p. 1)  In *Kim, supra,* the court found that  a 90 minute interrogation at the defendant's place of business was "a full-fledged interrogation, not a brief inquiry" *Id.* 292 F.3d at 977  In *Craighead* a 30 minute interrogation was found to be custodial. *Id*. 593 F.3d at 1078.  In *United States v.Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985) an interrogation that lasted over an hour was likewise found to be custodial.

A three hour and forty minute interrogation is certainly at the high end[7] of Ninth Circuit precedent regarding this factor and weighs heavily in favor of a finding that Mr. Iannetti was in custody.

## C.  MR. IANNETTI WAS SUBJECTED TO ACCUSATORY QUESTIONING AND CONFRONTED  WITH EVIDENCE OF GUILT

Mr. Iannetti was confronted with evidence of his guilt both before and immediately after the interrogation began.  Shortly after entering the viewing room Mr. Iannetti was told he was under investigation for mail and wire fraud. He asked to review the search warrant and

---

[7] In *Kim*, *supra*, the dissent conceded that a 90 minute detention ". . . admittedly seems on the high end of our precedent." Id. 292 F.3d at 981.

1   attachments, which contained information implicating him in the sale of counterfeit Miro prints.

2   Greenspan specifically pointed out that the warrant referred to the "Quatre Colors" that he had

3   purchased from the gallery in December. Shortly after the actual  questioning began the

4   interrogation turned accusatory.  Mr. Iannetti was accused of lying about when he last saw

5   Bonfiglio,and he was told the "Quatre Colors" that Iannetti purchased from Bonfiglioli and sold

6   to Greenspan was a low quality fake.

7        The Ninth Circuit has found that a defendant is in custody where an interrogator adopts

8   an aggressive, coercive, and deceptive tone. *United States v. Bassagnani*, 560 F.3d 989, 994-995

9   (9th Cir. 2009)  In *United States v. Beraun-Panez*, 812 F.2d 578, 579 (9th Cir. 1987),  the court

10  found  that the fact that officers demanded to know why Beraun-Panez was lying and said they

11  knew the truth was found to mitigate in favor of a finding that the interrogation was custodial.  In

12  *United States v.Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985), the court noted that " [t]he

13  questioning progressed for over an hour and turned accusatory - Waunkea was told that he

14  supplied information that only the perpetrator could know, that he matched the description of the

15  rapist, and that he had better tell the truth."  In *United States v. Brobst*, *supra*,  558  F.3d  982,

16  995 (9th Cir. 2009), when the defendant entered his residence he was told that  the officers had a

17  search warrant for the residence and provided him with a copy of it. He was then confronted with

18  the fact that they had found child pornography in his bedroom and asked if it was his. Id.  at 988-

19  989.  The court held that the fact that Brobst was immediately confronted with evidence of the

20  child pornography weighed in favor of a finding Brobst was in custody. Id. at 995.

21       When  Mr. Iannetti was first isolated in the viewing room he was told he was under

22  investigation for mail and wire fraud.  (Exhibit A at ¶ 8.)  He was then asked to review the

23  search warrant and attachments. Accusatory language in the attachments, the breadth of the items

24  to be seized, and the statements made to Iannetti by Greenspan while he was reviewing the

25  warrant, would certainly lead a reasonable person to believe that he was being confronted with

26  evidence of his guilt.

27       Attachment B to the warrant described the "Items To Be Seized". (Exhibit B, at pp.1-4.)

28

The first sentence declared that all the items to be seized *"are* evidence . . . of mail fraud . . . and/or of wire fraud . . .".  (Exhibit B at p.1., emphasis added.)

Paragraph a. of Attachment B generally referred to the seizure of all pieces of art (prints, lithographs, etchings) by Miro.  Paragraph a.1.,  specifically referred to the  "Quatre Colors Aparien El Mon" series by Miro, one of which had been sold to Greenspan in December 2007. (Exhibit B at p.1)  While Iannetti  was reviewing this page Greenspan pointed to  paragraph a.1. and said sarcastically *"you remember this piece don't you?"* (Exhibit A at ¶ 9., emphasis added) Paragraph c. on this same page authorized the seizure of all business records that had anything to do with Iannetti and/or his gallery and a number of persons with Italian names. One of the persons listed was Elio Bonfiglioli, the person who sold Iannetti the "Quatre Colors" print purchased by Greenspan.  Paragraph d. on the same page referred to all business  records relating to the sale of Miro art works from January 1, 2001 to the present.  The next page three pages referred to all inventory records relating to Miro for the same time period, all reference books related to Miro, and all computers and electronic records located at the gallery. (Exhibit B at pp. 2-4)

Immediately after Mr. Iannetti  finished his review of the warrant and attachments the interrogation began and quickly turned hostile and accusatory. Greenspan began by asking him some general questions about Elio Bonfiglioli.  When asked when he had last met with Bonfiglio Iannetti answered that he last met with him in April of 2007.  Greenspan then angrily and loudly accused Iannetti of lying. Iannetti was told him that he shouldn't lie to the agents because they knew "everything".  Greenspan then told him that postal agents had followed Bonfiglioli when he was in San Francisco on November 8-9, 2007 and had observed them meeting at the gallery. Greenspan also indicated that they knew Iannetti had bought Miro prints from him at that time, including the "Quatre Colors", and showed him a consignment invoice[8] dated November 10, 2007 which reflected this fact. (Exhibit A at ¶ 10.)

[8] Exhibit B at p. 5.

Motion To Suppress Statements
CR 09-0850 VRW                                    12

1         Mr. Iannetti states that after he apologized for "misremembering" the date he last

2   met with Bonfiglioli Greenspan became angrier and told him in a threatening manner that he was

3   in serious trouble and that he had better tell the truth.  Greenspan  compared Iannetti's situation

4   to that of Barry Bonds in the Balco case. He told Iannetti that Bonds had also lied to federal

5   agents and was now looking at federal jail time. He also told Iannetti that the "Quatre Colors

6   Aparien El Mon" print he had sold to him in December had been examined by an art expert who

7   determined that it was a low quality fake. Greenspan then indicated  that if Iannetti continued to

8   lie the prosecutor and the judge would not be very sympathetic towards him. (Exhibit A at ¶ 10.)

9        Not surprisingly, Esteban describes this portion of the interrogation in more antiseptic

10  terms: " we . . . confronted Iannetti about Bonfiglioli's actual visit to San Francisco in

11  November 2007. . .  We told Iannetti that we knew Bonfiglioli was in San Francisco last year and

12  that he and Bonfiglioli met with each other on November 9th and 10th in San Francisco in 2007,

13  and that Iannetti received *those art  prints* at that time." (Exhibit E at p.2, emphasis added)   As

14  discussed above "those art prints" included the same "Quatre Colors Aparien" sold to Greenspan

15  in December 2007. Esteban also indicates that "we advised Iannetti that it was in his best interest

16  to be truthful with us and that we were not making any promises to him. **. . . .** We advised

17  Iannetti about our undercover purchase . . . of "Quatre Colors Aparien el Mon" on December 24.

18  We told Iannetti that the art print was examined by an art expert and deemed to be a "low quality

19  fake".  (Exhibit E at p. 2 )

20       The initial questioning of Mr. Iannetti has all the hallmarks of a well designed and

21  thought out plan to extract a confession by the use classic police interrogation techniques. Mr.

22  Iannetti was isolated in a room with two agents while other agents searched his gallery. He was

23  told he was being investigated for mail and wire fraud. He was instructed to review a warrant

24  which clearly tied him to the sale of counterfeit Miro prints. He was first asked general and

25  innocuous questions about his relationship with Bonfiglioli. He was then asked when they had

26  last met, a question obviously asked with the hope that he would give them a date different than

27  November 9th or 10th.  When he did so, he was accused of lying and confronted with the

28

undercover surveillance of Bonfiglioli's visit to the gallery in November.  He was also told that the agents "knew everything" including the fact that the Miro he had sold to Greenspan was a "low quality fake".

Mr. Iannetti was clearly confronted with evidence of his guilt during an interrogation that quickly turned hostile and accusatory. According to *Beraun-Panez*, *Wauneka*, and *Brobst*, *supra,* this factor weighs heavily in favor of a finding that Mr. Iannetti was in custody during his interrogation.

## D.  THE AGENTS EXERCISED COMPLETE CONTROL OVER MR.  IANNETTI'S ART GALLERY

By exercising complete control over Mr. Iannetti and his place of business the agents created a "police dominated atmosphere" which negated the fact that the interrogation took place in  familiar surroundings.  When Mr. Iannetti arrived at the gallery the door was locked and it was full of searching agents. Once he entered the gallery Greenspan ushered him into the viewing room where he was isolated from any employees who may have been on the premises. When his wife arrived at the gallery she was told to go away. She was eventually allowed to stay, however she was kept isolated from her husband and was guarded by one of the agents.  Finally, on the two occasions Mr. Iannetti left the viewing room, Mr. Iannetti was accompanied and monitored by one of the agents.

An interrogation conducted in familiar surroundings may be found to weigh against a finding that the defendant was in custody[9], however,  the Ninth Circuit has also recognized that consideration of the familiarity of the physical surroundings in the custodial interrogation context may be neutralized where law enforcement officers take complete control over the environment and create "a police-dominated atmosphere." *United States v. Brobst*, 558 F.3d 982 (9th Cir. 2009);  *United States v. Craighead*, 539 F.3d 1073 (9th Cir 2008); *United States v. Kim*, 292 F.3d 969 (9th Cir. 2002);  *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982).

A number of factors are considered when determining whether the police have taken

---

[9] *See Beckwith v. United States*, 425 U.S. 341, 346-48 (1976)

"complete control" over the location where the interrogation was conducted:  (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Craighead*, *supra,* 593 F.3d at 1084.  An analysis of each of the first three factors under the circumstances of this case heavily mitigates in favor of finding that Mr. Iannetti's interrogation took place in a "police dominated atmosphere"[10]:

### Number of Agents

There were at least eight agents involved in the search of Mr. Iannetti's gallery. (Exhibit D at ¶ 4.c.)  When Mr. Iannetti entered the gallery it was crowded with law enforcement agents who were taking photographs or videos, going through his business records, and examining various works of art. (Exhibit A at ¶ 5)  In *Craighead*, *supra*, the court found that "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere" and cited cases involving eight, seven, and five officers as examples of what it meant by a large number of officers. (Id. 539 F.3d at 1085.)  The eight or more agents involved in the execution of the search warrant herein certainly contributed to making  Iannetti's gallery a police dominated atmosphere.

### Mr. Iannetti Was Restrained

Although Mr. Iannetti was not physically restrained he reasonably felt he was subject to police domination and was not free to leave. A discussed  above,  Mr. Iannetti was commanded to leave his home and come to the gallery. When he got there the door was locked and he had to knock in order to gain entry. He was directed to follow Greenspan into the viewing  room at which time the door was closed. During the entire time he was in the viewing room Esteban stood or sat between him and the only exit.

---

[10]  The fourth factor, which also mitigates in favor of a finding that Iannetti was in custody will be discussed at III. E., *infra*.

Motion To Suppress Statements
CR 09-0850 VRW

15

1    On the two occasions he was allowed to leave the viewing room he was accompanied and

2    monitored by an agent.  The first occurred when he asked to go to the bathroom.  An agent

3    walked him to the bathroom and stood outside the bathroom door.  The agent appeared to be

4    concerned about the amount of time he was taking and knocked on the door two or three times

5    and asked him if he was all right.  When Iannetti left the bathroom the agent walked him back to

6    the viewing room. (Exhibit A at ¶ 12.) The second occurred when he was allowed to leave the

7    viewing room to comfort his wife.  He was accompanied by both Esteban and Greenspan on this

8    occasion. (Exhibit A at ¶ 13.) At the conclusion of the interrogation Esteban accompanied

9    Iannetti while he identified Miro prints he had purchased from Bonfiglioli. (Exhibit A at ¶ 14.)

10   In *Craighead*, the court pointed out that restraint may be accomplished without

11   threatening or handcuffing a suspect:

12       Restraint amounting to custody may also be inferred where law enforcement

13       officers permit the suspect to move around the house for brief periods but insist

14       on escorting and monitoring him at all times. See *Mittel-Carey,* 493 F.3d at 40

15       (finding an interrogation custodial where the suspect was escorted by agents on

16       the three occasions that he was permitted to leave the interrogation space,

17       including while he used the bathroom); *Griffin,* 922 F.2d at 1350-51 ("We realize

18       that the likely effect on a suspect of being placed under guard during questioning,

19       or told to remain in the sight of interrogating officials, is to associate these

20       restraints with a formal arrest.") (539 F.3d at 1085-1086.)

21   Mr. Iannetti was clearly restrained with in the meaning of *Craighead*, *Mittel-Carey*, and

22   *Griffin*, *supra*. He was escorted by agents to the room where the interrogation took place and the

23   only way out was a closed door which was blocked by an agent. On each occasion that he left the

24   interrogation room he was escorted and monitored by at least one agent.

25   **Mr. Iannetti Was Kept Isolated From His Wife And Employees**

26   Mr Iannetti was kept isolated from his wife when she entered the gallery to inquire about

27   his whereabouts and well-being. When Mr. Iannetti arrived at the gallery he did not see any of

28

the employees he expected to be there.  Apparently, all but one had been interviewed and excused before he arrived [11].   In *Craighead*, *supra*, the court noted that the Supreme Court, in *Miranda*,  had ". . . highlighted isolation from the outside world as perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide self-incriminating statements . Id. 539 F.3d 1087.  It then pointed out that: "'A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements . . .'" Id. 539 F.3d at 1987 citing *Griffin*, *supra*, 922 F.2d at 1352

    In the instant case the agents kept Mr. Iannetti isolated from his wife when she came to the gallery to see him.  Elena Iannetti arrived at the gallery around  3:00 p.m. and found a locked door and the gallery full of people she did not recognize.  When an agent came to the door she identified herself as Iannetti's wife and asked to see him. The agent told her that the gallery was closed and shut the door in her face.  She remained at the front door crying.  After an unsuccessful attempt to obtain help from a lawyer she decided to unlock the door and go in anyway. When she entered an agent rushed up to her and pushed her back towards the front door to keep her from going to the back of the gallery.  She became hysterical and began screaming that she wasn't going to leave until she saw her husband. At this point the agents walked out of the viewing room with Mr. Iannetti and he attempted to calm her down. When she still refused to leave she was allowed to sit in the gallery with agent by her side.  Significantly, Mr. Iannetti's was returned to the viewing room and his interrogation continued for an hour or more. (Exhibit C at ¶ 7-10.)

    In  *Kim*, *supra*, the interrogation took place at the defendant's place of business. When Mrs. Kim arrived at her store with her husband the police were executing a search warrant. They allowed her into the store, but locked the door behind her leaving her husband outside. Once inside the store she was kept isolated from her son who had been in the store at the time the

---

[11] It appears that one employee, Margaret Aitken, was still on the premises being interviewed by the agents, however, Mr. Iannetti did not see her. (Exhibit D at ¶ 4.d.)

1    police entered. The court found that "isolating the defendant from the outside world - *here from*

2    *her husband who had tried to join her in the shop - largely neutralizes the familiarity of the*

3    *location as a factor undermining coercion."* Id. 292 F.3d at 977.( Emphasis added.)

4        In *Craighead*, *supra*, the defendant, who was in the armed forces, was present at his home

5    during the execution of a search warrant by eight law enforcement officers.  He was escorted to a

6    back storage room of his house and the door was closed behind him. A non-law enforcement

7    serviceman was brought along by the searching agents to provide emotional support for

8    Craighead, however, he was not allowed into the back room and it appeared that Craighead never

9    knew he was there. Nevertheless the court found the refusal to let this other person into the

10    interrogation room was significant: "The fact that Craighead did not event realize that Sergeant

11    Ramsey was there to provide emotional support only underscores this point; he migh have

12    discovered Sergeant Ramsey was there to offer emotional support if SA Andrews had in fact

13    permitted Sergeant Ramsey to accompany Craighead into the storage room and provide such

14    support." Id. 539 F.3d at 1087.

15        The circumstances of Mr. Iannetti's interrogation include elements of isolation found in

16    both *Craighead* and *Kim*.  When Mr. Iannetti arrived at the gallery at least eight  agents were

17    searching the premises.  He was escorted to a room in the back of the gallery and the door was

18    shut. He did not see any of the employees who were supposed to be working in the gallery that

19    day and he did not learn of the presence of the one employee who was present who could have

20    provided him with emotional support. Later, when his wife arrived at the gallery for purpose of

21    providing such support she was denied entry. When she essentially forced her way into the

22    gallery Iannetti was allowed to comfort her for a few moments, but she was allowed to stay, only

23    on the condition that she sit in the main body of the gallery while under guard and isolated from

24    her husband. Under these circumstances the familiarity of the physical surroundings in which Mr.

25    Iannetti's interrogation took place was clearly neutralized.

26

27

28

### E.  A REASONABLE PERSON  WOULD  NOT HAVE FELT FREE TO LEAVE THE GALLERY

Mr. Iannetti reasonably felt that he was not free to leave the gallery despite being told by the agents at the beginning of the interrogation  that he could leave and that they were not there to shut down his business or arrest him. **(**Exhibit A at ¶ 8.)

In *Craighead*, *supra*, the court pointed out that "[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*.  We must consider the delivery of these statements within the context of the scene as a whole . . . The *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test asks whether 'a reasonable person would have *felt* he or she was not at liberty to terminate the interrogation and leave." (emphasis added in original)." *Craighead*, *supra*, at 1088, quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

An examination of the "context" in which Greenspan's statement to Iannetti that he was free to leave the room took place must consider that the statement was made:  (1)  *after*  Iannetti had been called at home and ordered to come to the gallery with proof of identification; (2)  *after* Iannetti was told to follow Greenspan  through a crowd of searching agents and ushered into the viewing room ; (3)  *after*  the door was closed and Esteban took a position which blocked the only way out of that room; and (4)  *after* Iannetti  was told  that he was under investigation for mail and wire fraud and then asked if he would answer a few questions. Would a reasonable person in Mr. Iannetti's position  have felt free to leave the room at that point?  Clearly, he would not.

Mr. Iannetti was then asked to review the search warrant. While he was reviewing the warrant Greenspan pointed to the paragraph which indicated  that one of the items to be seized as "evidence" of mail and wire fraud was the print he had bought from Bonfiglioli and sold to Greenspan. He was then asked some general questions about his relationship with Bonfiglioli. When he told Greenspan he had not seen Bonfiglioli since April of 2007 he was accused of lying, told about the surveillance of his gallery in November and the fact that he had been seen meeting

with Bonfiglioli.  When he tried to explain that he mis-remembered he was told that the agents "knew everything",  including the fact that the "Quatre Colors" sold to Greenspan was a low quality fake.  His situation was compared to that of Barry Bonds, a thinly veiled threat that if he did not cooperate he would be facing federal jail time. Would a reasonable person in Mr. Iannetti's position have felt free to leave the room at that point?  Clearly, he would not.

For the sake of argument only, even if the court were to somehow consider the beginning of Mr. Iannetti's interrogation "voluntary", the fact that it quickly became confrontational and accusatory turned it into a custodial interrogation.  *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982) ;*United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir. 1987);  *Kim, supra*, 292 F.3d at 973   The Ninth Circuit has held that advising a person at the beginning of an interview that he was free to leave is negated when the interview quickly turns accusatory.

In *United States v. Lee*, *supra*,  the defendant was asked if he would agree to be interviewed in an FBI vehicle which was parked in front of his house. When Lee entered the vehicle with two agents he was told that he was free to leave the car or terminate the interview at anytime. At the beginning of the interview the police allowed him "to repeat his exculpatory story and then confronted him with evidence of his guilt and told him it was time to tell the truth .. ." Id. 699 F.2d at 467.  The court held that in "such circumstances a reasonable innocent person would not feel free to leave". Id. at 468.

Mr. Iannetti's interrogation is strikingly similar to the interrogation in *Lee*.  Mr. Iannetti was asked a few general questions about his relationship with Bonfiglioli and then he was angrily accused of lying to the agents about when they last met.  He was confronted with the clandestine surveillance of Bonfiglioli and an invoice which proved that he bought the "Quatre Colors" during that meeting.  He was advised that an expert had examined the print he had sold to Greenspan and said it was a "low quality" fake.  The agents told him they "knew everything".  In other words they knew he was guilty.  Any reasonable person would not have felt free to leave the room at that point.  Moreover, as the interrogation progressed the fact he was only allowed to

use the bathroom with a police escort and the fact that he was only allowed to see his wife briefly when she forced her way into the gallery could have only reinforced the reasonable conclusion that he was not free to leave the room..

### F. THE TOTALITY OF THE CIRCUMSTANCES ESTABLISH THAT MR. IANNETTI  WAS IN CUSTODY AT THE TIME HE MADE HIS STATEMENTS TO THE  POSTAL AGENTS

The totality of the circumstances in this case overwhelmingly support a finding that Mr. Iannetti was in police custody at the time he made his statements to Greenspan and Esteban.  He did not voluntarily come the to the gallery. He was commanded to do so by inspector Greenspan. When he arrived at the gallery it was completely under the control of at least eight law enforcement agents and he had to knock to gain entry.  His employees were nowhere to be seen. He was ordered into the viewing room and the door was closed.  Esteban blocked the only exit from the room. He was told that although he was under investigation for mail and wire fraud the agents were not intending to arrest him at that time or shut down his business. Shortly after the questioning began he was accused of lying and confronted with evidence of his guilt. As the interrogation progressed he realized that he could not leave the room without a law enforcement escort.  When his wife arrived at the gallery she was initially refused entry**.** When she did enter she was kept isolated from him.  No reasonable person would have felt that he was free to leave the gallery under these circumstances.

Each of the factors analyzed above make it clear that Mr. Iannetti's interrogation was custodial and *Miranda* warnings were required.  Mr. Iannetti's statements should be suppressed.

///
///
///
///
///
///

Motion To Suppress Statements
CR 09-0850 VRW

**CONCLUSION**

For the reasons set forth above Mr. Iannetti respectfully requests that the Court grant his motion, and accord other relief as it deems just.

Dated: March 19, 2010                                    Respectfully submitted,

                                                         _____/s/_____
                                                         Alan A. Dressler
                                                         Attorney for Defendant
                                                         Pasquale Iannetti